IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:09-CT-3187-D

SANDRA ETTERS, et al.,                )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )          **MEMORANDUM AND**
                                      )          **RECOMMENDATION**
SECRETARY KIERAN SHANAHAN, et         )
al.,                                  )
                                      )
          Defendants.                 )

 This case comes before the court pursuant to the order (D.E. 133 at 2-3) of Chief District

Judge James C. Dever III, entered 30 May 2012, allowing the motion by plaintiff Sandra Etters

("Etters") for a default judgment against defendant Charlie Cortez Simms ("Simms") (D.E. 132)

and referring the case to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B), for a hearing and

memorandum and recommendation on the issue of damages due plaintiff from Simms. The

hearing was held on 7 November 2012. (*See* D.E. 142, 148). Etters subsequently submitted a

supplemental memorandum (D.E. 147) as directed by the court (*see* D.E. 144). For the reasons

set forth below, it will be recommended that Etters be awarded $100,000.00 in compensatory

damages and $100,000.00 in punitive damages, for total damages of $200,000.00.

## BACKGROUND

### I. Plaintiffs' Claims

 In their complaint, filed 18 November 2009, Etters and three other women (collectively

"plaintiffs") alleged that they were North Carolina state inmates; that various employees of the

then North Carolina Department of Correction ("DOC")[1] sexually assaulted, abused, or harassed them; and that certain supervisory officials did not prevent the sexual abuse or misconduct. (Complaint (D.E. 1), *e.g.*, 1-2; ¶¶ 10-12). Plaintiffs asserted claims pursuant to 42 U.S.C. § 1983 ("§ 1983") for violation of the First, Fourth, Eighth, and Fourteenth Amendments on behalf of themselves and a class of others similarly situated. (Compl. 1-2; ¶¶ 39-52). The complaint sought injunctive relief, compensatory and punitive damages in an unspecified amount, and attorney's fees. (*Id.* 23-24, Prayer for Relief). Etters alleged specifically that as a result of the abuse by Simms, a corrections officer, she suffered physical injury and severe psychological and emotional distress and physical injury, "including depression, difficulty sleeping and eating, and bouts of crying." (*Id.* ¶ 33(g), (h)). The defendants served with plaintiffs' complaint other than Simms answered the complaint, denying any wrongdoing. (*See* D.E. 19, 20, 21, 22, 23, 24, 25, 28, 54).

On 16 March 2011 (*see* D.E. 57 at 27-28), the court dismissed claims against various defendants. In its order of 30 May 2012 (D.E. 133 at 2, 3-4), the court approved two voluntary dismissals by another plaintiff (D.E. 133 at 2) and approved a settlement (D.E. 130-1) by the parties providing for changes to state policies concerning reporting and investigating claims of sexual abuse by inmates. The only remaining claims are those by Etters against Simms under

---

[1] As a result of a reorganization by the State of North Carolina, the DOC is now the Division of Adult Correction, a unit of the Department of Public Safety. *See* N.C. Gen. Stat. § 143B-600(a)(1); *see also* D.E. 133 at 1 n.2.

§ 1983 for violation of her rights under the Fourth[2] and Eighth[3] Amendments.

## II. Default Proceedings against Simms

Simms was served with process on 17 February 2010. (*See* D.E. 48). On 25 February 2011, the Clerk entered default against Simms, pursuant to Fed. R. Civ. P. 55(a). (*See* D.E. 56).

On 21 May 2012, Etters filed a motion for entry of default judgment against Simms (D.E. 132). As indicated, the court allowed the motion on 30 May 2012 (D.E. 133 at 2-3) and referred the case to the undersigned for a hearing, and memorandum and recommendation on the issue of damages owed plaintiff by Simms.

The undersigned held the hearing on 7 November 2012. (*See* D.E. 142). At the hearing, Etters was the only witness. She introduced six exhibits: a handwritten statement by her dated 11 October 2007 (Pl.'s Ex. 1 (D.E. 139-1)); a handwritten statement by her dated 22 October 2007 (Pl.'s Ex. 2 (D.E. 139-2)); a DOC memorandum dated 12 October 2007 verifying Simms'

---

[2] The Fourth Circuit has recognized a narrow right to bodily privacy in the prison context. *Lee v. Downs*, 641 F.2d 1117, 1119-21 (4th Cir. 1981) ("Most people . . . have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating."). "When not *reasonably necessary*, that sort of degradation [*i.e.*, involuntary exposure of one's genitals in the presence of the opposite sex] is not to be visited upon those confined in our prisons." *Jones v. Price*, 696 F. Supp. 2d 618, 623 (N.D.W. Va. 2010) (emphasis in original) (quoting *Lee*, 641 F.2d at 1119)); *see also Skundor v. Coleman*, No. Civ. A. 5:02–0205, 2003 WL 22088342, at *10 (S.D.W. Va. 31 Jul. 2003) (holding visual body cavity searches permissible under the Fourth Amendment where the searches were reasonable and not motivated by punitive intent).

[3] In order to establish that prison conditions violate the Eighth Amendment, a plaintiff must establish: "(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993). Sexual assault is a violation of the Eighth Amendment. *Boxer X v. Harris,* 437 F.3d 1107, 1111 (11th Cir. 2006) ("In this case, we join other circuits recognizing that severe or repetitive sexual abuse of a prisoner by a prison official can violate the Eighth Amendment."); *Boddie v. Schnieder*, 105 F.3d 857, 859 (2d Cir. 1997) ("[S]exual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim under Section 1983."); *see also Giron v. Corrs. Corp. of Am.*, 191 F.3d 1281, 1290 (10th Cir. 1999) ("Where no legitimate penological purpose can be inferred from a prison employee's alleged conduct, including but not limited to sexual abuse or rape, the conduct itself constitutes sufficient evidence that force was used 'maliciously and sadistically for the very purpose of causing harm.'"); *Brooks v. Bufford*, No. 2:10–689–TLW–BHH, 2011 WL 2119281, at *6 n.6 (D.S.C. 3 Mar. 2011) ("Because allegations of sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.") (citing *Boddie*, 105 F.3d at 861)); *Smith v. Beck*, No. 1:08CV166, 2011 WL 65962, at *5 (M.D.N.C. 10 Jan. 2011) ("Sexual abuse of an inmate may be actionable [under the Eighth Amendment] where a correctional officer is in a position of authority over a prisoner.").

placement on investigatory status (Pl.'s Ex. 3 (D.E. 139-3)); a report dated 26 November 2007 on a polygraph examination of Simms (Pl.'s Ex. 4 (D.E. 139-4)); a letter dated 28 November 2007 to the Warden of the North Carolina Correctional Institution for Women ("NCCIW") regarding an internal affairs interview of Simms (Pl.'s Ex. 5 (D.E. 139-5))[4]; and a letter dated 19 December 2007 from the Warden of the NCCIW to Simms terminating him and providing the basis for the termination (Pl.'s Ex. 6 (D.E. 139-6)).  (*See* Exhibit List (D.E. 143-1)).

## III.   Etters' Evidence

Since 2003, Etters has been serving a sentence for murder and conspiracy to commit murder arising from an abusive relationship.  (Transcript of Proceedings ("Tr.") (D.E. 148) 9:24 to 10:11; 10:18-24).  Her expected release date is 2021.  (Tr. 23:19-21).

Etters first remembered seeing Simms regularly when she worked at a laundry job at NCCIW in 2007.  (Tr. 9:18-23; 13:14-18).  One night in August of 2007 while working third shift laundry, she went into a conference room and Simms told her to perform oral sex on him. (Tr. 14:20 to 15:6; 17:3-9).  She initially declined and he threatened that if she did not comply, she would "go to jail"—that is, to a segregated housing unit where an inmate is confined 24 hours a day, 7 days a week.  (Tr. 15:7-20; 16:2-4).  She knew that as a result she would lose everything she had worked for in prison.  (Tr. 15:7-12).  This included her prison job (for which she received pay and days off her sentence), school classes, room assignment, and special visiting privileges with her children through the prison match program.  (Tr. 15:10 to 16:4; 21:18-22).  That program enabled inmates to visit with their children in a studio apartment setting for four hours at a time.  (Tr. 13:1-8).  She felt as if she did not have a choice and

---

[4] Etters' description of this exhibit in the Pretrial Order (D.E. 141 § IV) misidentifies it as being from the Warden when, in fact, it was to the Warden.

ultimately complied with Simms' demand. (Tr. 16:5-9). She did not report what happened because she did not think the authorities would believe her. (Tr. 16:10-13). In one of her written statements,[5] she states that she planned to kill herself after this incident, but did not after two of her friends intervened. (*See* Pl.'s Ex. 2 at 2).

Etters experienced other similar incidents with Simms which she cannot recall in detail because she has blocked them out, something she has done in her life during other abuse she has suffered. (Tr. 17:15-23; *see also* Pl.'s Ex. 2 at 1, 2). She did remember one incident in the laundry room where Simms grabbed her by the hair, pulled her back into a conference room, and had her perform oral sex. (Tr. 17:24 to 18:3). In another incident by a cleaning closet, he raped her vaginally and anally. (Tr. 18:4-5). She also recounted an assault—the final one—in which Simms handcuffed her and, apparently after forcing her to have oral sex, was attempting to anally rape her when he was interrupted by a bell indicating that another officer was coming. (Tr. 19:9-16; Pl.'s Ex. at 2).

As with the initial assault by Simms, Etters did not report any of the subsequent assaults at the time they occurred because of fear of being sent to segregated housing and the resulting consequences. (Tr. 18:25 to 19:4; *see also* Pl.'s Ex. 2 at 2-3). She did, though, confide in a

---

[5] While the written statements by Etters were not made in court or under oath, they do bear some indicia of trustworthiness and could arguably come within the residual hearsay exception in Federal Rule of Evidence 807, assuming without deciding that the Federal Rules of Evidence apply to a hearing to determine default damages. *See Fox v. Se. Transp. Inc.*, 25 F.3d 1037, at *2 (1st Cir. 1994) (table) (finding regarding hearing on default damages that admission of testimony challenged as hearsay harmless "if we were to assume arguendo . . . that the Federal Rules of Evidence apply"); *cf. Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 589 F. Supp. 2d 25, 32 (D.D.C. 2008) (rejecting reliance on third-party hearsay in support of default judgment). Such indicia include: Etters' seemingly reasonable fear of retaliation by prison officials if she did provide information about the assaults by Etters; her making the statements only when pressured by prison officials to do so; the general consistency of the statements with her testimony; the highly personal and detailed nature of much of the information provided (*e.g.*, her procedure for handling underwear after assaults); the making of the statements apparently within days after the assaults stopped (in contrast to the testimony, which was given more than five years afterward); and Etters' signature of the affirmation on each statement that "it is to the best of my knowledge, a true and accurate statement of fact." (Gov.'s Exs. 1, 2). In any event, the statements do not make any material points not addressed in her testimony, albeit in more abbreviated form, and the court's recommendation on damages would be the same even if the statements were not considered for the truth of the matters asserted therein.

5

number of other inmates. (*See* Tr. 21:4-8; Pl.'s Ex. 1; Pl.'s Ex. 2 at 1, 2). In the case of the last incident, apparently around October 2011, another inmate saw cuts marks on Etters' wrists from the handcuffs and reported the matter to an officer. (Tr. 19:19-24; *see* Pl.'s Ex. 1).

When first questioned, Etters said in a written statement, dated 11 October 2007, that on three occasions Simms had her perform oral sex on him. (Tr. 19:25 to 20:15; Pl.'s Ex. 1). She did not disclose the vaginal and anal rape by Simms in the belief that oral sex would not be treated as harshly as the other activity because oral sex between correction officers and inmates was routine at NCCIW. (Tr. 20:1 to 21:1). Etters lost her job and schooling after her initial statement, as she had feared. (Tr. 21:12-20). She was not permitted to work again for about a year. (Tr. 21:23 to 22:10).

Etters later provided a second written statement (Pl.'s Ex. 2), dated 22 October 2007, disclosing more fully what Simms had done. (Tr. 21:2-10). She made the fuller disclosure because officers had already learned more about the incidents by finding a letter she had written to another inmate about them. (Tr. 21:4-10).

In her second statement, she described an assault by Simms, when "he wanted to try his meds," in which he penetrated her orally, vaginally, and anally. (Pl.'s Ex. 2 at 1). The assault was so rough she could hardly walk afterward. (*Id.*).

Although in her testimony Etters stated that Simms assaulted her "several" times (Tr. 18:10-11), she also testified and said in her second written statement that the assaults occurred on a regular basis when certain inattentive officers worked with Simms (Tr. 18:12-24; Pl.'s Ex. 2 at 1). In the second statement, she also stated that "[a]ctual sex" occurred on four to six separate occasions. (Pl.'s Ex. 2 at 2).

On 11 October 2007, Simms was given an investigatory placement status[6] for a period of 30 days (Pl's Ex. 3) and later administratively reassigned (Pl.'s Ex. 6 at 2). In an interview on 11 October 2007, he denied having sex with or handcuffing Etters. (Pl.'s Ex. 6 at 2). Simms submitted to a polygraph examination on 26 November 2007. (Pl.'s Ex. 4). Simms told the examiner Etters had asked him whether he would ever have sex with an inmate, which he said he would not, and about her having sex with another female inmate, which he said was her choice. (*Id.*; *see also* Pl.'s Ex. 5). The polygraph examiner found that Simms was deceptive in responding "no" to questions about whether he engaged in sexual activity with Etters. (Pl.'s Ex. 4). On 27 November 2007, Simms was interviewed about the statement he made to the polygraph examiner that Etters had solicited sex from him, which he had not reported at the time. (Pl.'s Ex. 5). In this interview, Simms claimed that on 10 October 2007 Etters had exposed one of her breasts to him, which he had also failed to report. (*Id.*). Thereafter, on 19 December 2007, the DOC terminated Simms for engaging in "undue familiarity with an inmate" and "unacceptable personal conduct." (Pl.'s Ex. 6). The letter does not adopt Etters' version of events, but instead finds that Simms acted improperly based on his own account of what had happened. (*Id.* at 3-4).

Etters sought mental health treatment as a result of the assaults by Simms, but it took several months for counseling to begin. (Tr. 22:13-23; 23:2-5). She still sees a mental health counselor about once a month. (Tr. 23:2-9).

Because Etters was raised in an abusive home and involved in an abusive relationship as an adult, the prison environment provided her a feeling of safety, including the ability to sleep

---

[6] *See* 25 N.C. Admin. Code 1J.0615 ("Investigation status is used to temporarily remove an employee from work status. Placement on investigation with pay does not constitute a disciplinary action . . . .").

well, for the first time in her life. (Tr. 10:12-15; 11:4-8; 14:9-13). The incidents with Simms, however, deprived her of this feeling of safety. (Tr. 23:17-21).

At the hearing and in her supplemental brief, Etters, through counsel, argued that an award of $100,000.00 against Simms, including both compensatory and punitive damages, would be appropriate for the harm Simms caused her. (Tr. 26:23 to 27:3).

## DISCUSSION

### I.    Procedure for Determining Default Damages

After a court determines, as here, that a judgment by default should be entered, it must determine the amount and character of the recovery that should be awarded. *See Hewitt v. Morris*, No. 0:12–666–MGL–PJG, 2012 WL 6864598, at *1 (D.S.C. 20 Dec. 2012) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2688 at 63 (3d ed. 1998)). "The court must make an independent determination regarding damages, and cannot accept as true factual allegations of damages."[7] *J & J Sports Prods., Inc. v. Waters,* No. 3:12–cv–267–RJC–DCK, 2012 WL 5930167, at *2 (W.D.N.C. 27 Nov. 2012). The court may, as in this case, conduct a hearing to determine the amount of damages. Fed. R. Civ. P. 55 (b)(2)(B). The damages "must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

### II.    Compensatory Damages due Etters

#### A.    Satisfaction of Physical Injury Requirement under the Prison Litigation Reform Act ("PLRA")

The Prison Litigation Reform Act ("PLRA") establishes limitations on recovery of compensatory damages by prisoners in civil lawsuits by providing that "no Federal civil action

---

[7] In contrast, when making the initial determination whether to award a default judgment, "the Court takes as true the well-pleaded factual allegations in the complaint, other than those pertaining to damages." *Clancy v. Skyline Grill, LLC*, No. ELH–12–1598, 2012 WL 5409733, at *2 (D. Md. 5 Nov. 2012).

may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e; *see also Miller v. Clark,* No. 3:11-cv-00557, 2011 WL 6955512, at *3 (S.D.W. Va. 9 Dec. 2011) ("Moreover, to maintain a plausible claim for compensatory damages, the prisoner must assert and prove that a physical injury resulted from the violation. Allegations of an emotional injury without an underlying physical injury are insufficient to support an award of compensatory damages."). Courts considering the question have found that sexual assaults can constitute a "physical injury" under the PLRA. *Carrington v. Easley*, No. 5:08-CT-175-FL, 2011 WL 2132850, at *3 (E.D.N.C. 25 May 2011); *see also Liner v. Goord*, 196 F.3d 132, 135 (2d Cir. 1999) ("[T]he alleged sexual assaults qualify as physical injuries as a matter of common sense. Certainly, the alleged sexual assaults would constitute more than *de minimis* injury if they occurred.").

The court finds that the sexual assaults by Simms against Etters constituted physical injuries in satisfaction of the PLRA requirement. That is facially true with respect to Simms' vaginal and anal rapes of Etters. The acts of oral sex Simms forced Etters to perform are also properly considered physical injuries. *See Carrington*, 2011 WL 2132850, at *3 (finding correction officer's grabbing of inmate's penis in attempt to engage in oral sex a physical injury even though the inmate managed to escape without any sexual act occurring). In addition, there were physical injuries attendant to the sex acts, such as the cut marks left by handcuffing. Etters is therefore entitled to recover compensatory damages in such amount as the record establishes.

### B.     Amount

Etters seeks damages for the emotional distress she has suffered as a result of Simms' assaults and the cost of treatment for the emotional distress after she is released from prison.

Factors considered by the court in assessing a plaintiff's damages for emotional distress include: "the factual context in which the emotional distress arose; evidence corroborating the testimony of the plaintiff; the nexus between the conduct of the defendant and the emotional distress; the degree of such mental distress; mitigating circumstances, if any; physical injuries suffered due to the emotional distress; medical attention resulting from the emotional duress; psychiatric or psychological treatment; and the loss of income, if any." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007). "Courts scrupulously analyze an award of compensatory damages for a claim of emotional distress predicated exclusively on plaintiff's testimony." *Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996).

In *Trinidad v. City of Boston*, No. 07-11679-DPW, 2011 WL 915338 (D. Mass. 15 Mar. 2011), the court collected comparable cases and noted "[c]ourts awarding compensatory damages for—usually multi-incident—sexual assault and rape of inmates or detainees by prison guards and corrections officers have ranged from $100,000 to $500,000." *Id.* at *6. Specifically, it cited the following cases and awards:

> *Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000) (affirming a $350,000 jury award against the District of Columbia and its Department of Corrections for ongoing sexual abuse of a female inmate in light of a documented history of routine sexual abuse of women prisoners); *Mathie v. Fries*, 121 F.3d 808 (2d Cir.1997) (affirming an award of $250,000 in compensatory damages for the sodomy-rape of a pretrial detainee by a guard); *Ortiz v. Lasker*, No. 08–cv–6001L, 2010 WL 3476017 (W.D.N.Y. Aug. 30, 2010) (entering default judgment of $250,000 compensatory and $250,000 punitive damages against a corrections officer who physically and sexually abused an inmate); *Cash v. County of Erie*, No. 04–cv–0182–JTC(JJM), 2009 WL 3199558 (W.D.N.Y. Sept. 30, 2009) (entering default judgment of $500,000 compensatory and $150,000 punitive damages against a detention center guard who assaulted and raped an inmate); *Hall v. Terrell*, 648 F.Supp.2d 1229 (D. Colo. 2009) (entering default judgment of $354,070.41 in compensatory and $1 million in punitive damages against an officer who routinely sexually assaulted and raped an inmate in his custody).

*Id.* at *6 n.5.

Here, Etters' allegations regarding the claimed emotional distress itself, as opposed to the underlying assaults, arguably originate exclusively from her, although, as discussed below, there is corroboration of the assaults. The court has, in any event, undertaken a scrupulous analysis of the award to her.

The events causing the emotional distress were horrific in nature, entailing forcible sexual violation of Etters. These assaults occurred on at least four occasions. Moreover, some assaults involved multiple sexual violations, each one of which was tantamount to a separate assault. Other forcible conduct apparently accompanied certain assaults, such as handcuffing. The physical injuries Etters incurred included the cut marks from handcuffing and, according to her second statement, pain so great after one incident that she could hardly walk. The occurrence of the assaults is corroborated, to varying degrees, by the fact that prison officials took Etters' claims seriously enough to conduct an investigation into them; the results of Simms' polygraph examination; Simms' termination for misconduct, albeit not based on Etters' version of events; and Etters' written statements which, as indicated, were made around the time of the assaults.

By their nature, the assaults would be expected to directly cause extreme distress. And Etters testified that they did. They took from her the feeling of safety that the prison environment had provided her and that she had been unable to find outside prison:

> I'm no longer safe, you know. It's, it's kind of hard to explain that when you first get to prison that you actually, actually could sleep. He took that, you know.

(Tr. 23:19-21). In her second statement, she spoke specifically of the feelings of guilt, shame, and dirtiness that the assaults produced and her intention to commit suicide after the first assault. She also mentions the anguish of attempting to figure out why Simms picked her to victimize. (Ex. 2 at 2).

Etters' testimony regarding her emotional distress (and all other matters) was credible. She testified forthrightly and with conviction. She was understandably emotional at times, but there was no indication she was embellishing. Her demeanor was otherwise indicative of truthfulness. The substance of her testimony was internally consistent. The trustworthiness of her testimony is further substantiated by the manifest propensity of assaults like those she suffered to cause severe emotional distress, her seeking out and obtaining mental health treatment after the assaults, and the consistency of her written statements with her testimony.

Based on the foregoing considerations, the court concludes that the sum of $100,000.00 will provide Etters adequate compensation for the emotional distress resulting from Simms' conduct. This amount is within the range recognized in the case law cited above.

This sum does not include any amount for the cost of mental health treatment after Etters is released from prison. Although she testified that she intends to receive treatment then, her release is not expected until about 8 years from now or 14 years after the assaults occurred, and she did not present evidence on the extent to which she will need treatment at that point or its cost. Any award for such treatment would therefore be speculative.

## III.    Punitive Damages due Etters

As indicated, Etters also requests punitive damages. The purpose of punitive damages is "deterrence and retribution." *Cooper Indus. Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001). "Punitive damages are available in an action under § 1983 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Carrington*, 2011 WL 2132850, at * 4 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). Punitive damages are discretionary. *Id.*

Here, the record clearly shows that Simms' assaults on Etters were motivated by evil motive and intent. He brutalized her for his own gratification. His conduct was also in reckless and callous indifference to Etters' federally protected rights. Thus, the award of punitive damages is appropriate in this case.

As to the amount of punitive damages, the horrific nature and multiplicity of Simms' assaults dictate that the award be substantial to achieve the objective of retribution against him. A substantial award is also necessary to help ensure that another inmate is not victimized as Simms was. While it is true that Simms was terminated from his job at the prison, that alone does not come close to providing adequate retribution or deterrence, particularly since he did not admit, but instead lied, about his conduct and his termination was not based on the facts as Etters related them.

The court concludes that the sum of $100,000.00 in punitive damages is adequate to serve the ends of retribution and deterrence. The court is aware that this sum and the like amount of compensatory damages it found to be adequate total twice the amount requested by Etters.[8] To her credit, Etters acknowledges that she lacks medical evidence of damages and other evidence that could warrant a higher award. (*See* Tr. 26:23 to 27:3). Nonetheless, for the reasons stated, the court believes that the sums specified are those which are adequate under the applicable legal standards and that the amount requested by Etters was not sufficient.

---

[8] Since Etters requested a specific amount of damages only in argument, but not in her complaint (*see* Compl. 24 ¶ 3), the award of damages exceeding the amount requested does not run afoul of the prohibition in Fed. R. Civ. P. 54(c) against awarding a default judgment exceeding the amount demanded in the pleadings.

## CONCLUSION

For the reasons set forth above, the court recommends that a judgment be entered awarding default judgment for Etters in the amount of $100,000.00 in compensatory damages and $100,000.00 in punitive damages, for total damages of $200,000.00.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to the respective parties, who have until 20 February 2013 in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections must be filed within 14 days after service thereof.

The Clerk shall today serve a copy of this order on Simms by first-class mail at the most current address the court has for him: 2824 Southpark Village Drive, Rocky Mount, NC 27803. The Clerk shall also make an appropriate record of such service on the docket sheet of this case.

SO ORDERED, this the 6th day of February 2013.

James E. Gates
United States Magistrate Judge